**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

In re:

**TWIN RINKS AT EISENHOWER, LLC,**          Chapter 11

                                            Case No. 15-72466-REG

                          **Debtor.**
-------------------------------------------------------------X

**DISCLOSURE STATEMENT**
**PURSUANT TO SECTION 1125**
**OF THE BANKRUPTCY CODE**

Carle Place, New York
July 9, 2015

                    **Jones & Schwartz, P.C.**
                    **Attorneys for Twin Rinks at Eisenhower, LLC**
                    **Debtor and Debtor in Possession**
                    **One Old Country Rd., Suite 384**
                    **Carle Place, New York 11514**
                    **Attention: Harold D. Jones, Esq.**
                    **(516) 873-8700**

**IMPORTANT: THIS DISCLOSURE STATEMENT CONTAINS INFORMATION**

**THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S CHAPTER 11 PLAN.**
**PLEASE READ THIS DOCUMENT WITH CARE.**

1

## I.    PLAN SUMMARY AND KEY CONSIDERATIONS

The following summary contained in this Section I is qualified in its entirety by the more detailed information appearing elsewhere in this Disclosure Statement. All capitalized terms contained in this Disclosure Statement shall, unless otherwise defined herein, have the meanings ascribed to such capitalized terms in Section II, "Definitions" or the Plan.

The Debtor is seeking acceptance of the Plan by holders of Allowed Unsecured Claims. The Debtor has prepared this Disclosure Statement in connection with its solicitation of acceptances of the Plan.

The Plan is proposed by the Debtor.

The Debtor believes that the Plan will yield an ultimate dividend of approximately _____% to the holders of Allowed Unsecured Claims in Class 3.

The Debtor believes that:

1.    the Plan provides the best possible result for the holders of Claims and Interests;

2.    with respect to Unsecured Claims, the distributions under the Plan are greater than the amounts which would be received if the Debtor was liquidated under Chapter 7; and

3.    acceptance of the Plan is in the best interests of the holders of the Claims.

**THE DEBTOR APPROVES OF AND SUPPORTS THE PRINCIPAL TERMS OF THE PLAN. THE DEBTOR RECOMMENDS ACCEPTANCE OF THE PLAN.**

ALL HOLDERS OF CLAIMS IN CLASS 3 MUST COMPLETE AND RETURN THEIR BALLOTS TO ACCEPT OR REJECT THE PLAN.

2

The Bankruptcy Court will hold a hearing (the "Confirmation Hearing") on confirmation of the Plan, at which time the Bankruptcy Court will consider objections to confirmation, if any, at 10:00 a.m. on _____, 2015 in the United States Bankruptcy Court, 290 Federal Plaza, Central Islip, New York 11722. The Confirmation Hearing may be adjourned from time to time without notice other than the announcement of an adjourned date at the Confirmation Hearing. Objections to confirmation of the Plan, if any, must be in writing and signed and filed as described in Section VIb, "CONFIRMATION AND CONSUMMATION PROCEDURE-Confirmation Hearing."

a.    **The Debtor**

Twin Rinks at Eisenhower LLC (the "LLC") was formed as of May 2012. Initial members of the LLC were Chris Ferraro ("Chris"), Peter Ferraro ("Peter") and Clearview Capital Management, LLC ("Clearview"). Clearview has all the rights and obligations of a manager of the LLC. The representative of Clearview that was responsible for the formation of the LLC and was the driving force behind pursuing the eventual project was Ronald Friedman ("RF"), the brother of Joel Friedman ("JF"). Today, Clearview is wholly owned by JF but, during the prior period, RF an attorney, was able to act on behalf of Clearview. RF had primary responsibility for all legal and business aspects of the Project, including negotiations of all contracts and supervision of the design and construction of the Twin Rinks facility. RF's son plays ice hockey and the initial relationship between RF, Chris and Peter was formed during Chris and Peter's coaching of RF's son, as Chris and Peter had recently returned to Long Island after retiring from professional ice hockey careers in the National Hockey League. As the relationship progressed, RF began to advise Chris and Peter on business matters. Chris and Peter often expressed a desire to find a home rink out of which to run

3

their clinics, camps and lessons because they often were forced to travel extensively across Long Island. Shortly thereafter on June 13, 2012, Nassau County issued a Request for Proposal for the development of a twin ice rink facility in Eisenhower Park (RFP# PR0611-1219).

RF encouraged JF to have Clearview invest in the LLC, which would submit a proposal in response to the County's RFP. At the time of the RFP submission, the Twin Rinks project was forecast to cost approximately $10.8 million. RF anticipated funding the project with 60-70% debt financing that he advised JF he believed to be forthcoming, as well as Funding from Clearview and a fourth investor who was an acquaintance of Chris and Peter. Chris' and Peter's contribution would be in the form of "sweat equity," for which they were to be granted an initial member ownership stake in the LLC of 7.5% each, which could increase to 15% each over time. However, it appears that RF performed inadequate due diligence prior to recommending the investment in the Twin Rinks project. In particular, RF did not properly evaluate the full scope and cost of construction.

The LLC submitted a proposal and was awarded the rights to pursue this development on or about August 2012. By this time, the fourth potential investor in the LLC withdrew from the project and the Operating Agreement for the LLC was finalized between Clearview, Chris and Peter. The LLC and the County of Nassau executed a License Agreement on or about October 19, 2012 that had been negotiated for the LLC by RF. RF signed the agreement as Treasurer of Twin Rinks and also executed a Certificate of Compliance stating that he was the Chief Executive Officer of Twin Rinks. By this time, the project cost was estimated to be $14,295,500.

The scope of the project grew from the initially contemplated 60,000 SF at the time of the RFP submission to approximately 85,000 SF by the time of the ceremonial groundbreaking in

4

January 2013 and the estimated cost of the project had escalated to over $18 million. By March 2013, that number had grown to over $22 million and by June 2013, to over $30 million for a 165,000 SF structure.

In September 2013, the LLC borrowed funds from Darien Rowayton Bank, which debt was eventually increased to $5.25 million and was secured by substantially all of the assets of the LLC and third party guarantees.

By November 2013 the estimated cost to completion was over $40 million. In December 2013, a fourth member was admitted to the LLC with 5% ownership based upon a purchase of 3% of Clearview's equity and 1% each of Chris and Peter's equity.

As the project's cost ballooned, JF expressed repeated concern about the escalating costs. JF had no real connection to the sport of hockey and had always viewed the project as an investment. By comparison, RF was focused on his son's involvement in the sport. JF knew that the project was running out of money and authorized absolutely no more capital improvements. The budget needed to be strictly enforced in order to protect the viability of the investment. All throughout the cost increases, JF was assured by RF that the costs would not go higher and thus Clearview continued funding the project with the expectation that the costs were finally on a strict budget and the project would still be viable yet have a lower investment return. Construction continued on the project into early 2014, with a partial certificate of occupancy granted for the first indoor rink in February 2014 and a full certificate of occupancy granted in June 2014.

In May 2014, JF became symptomatic with an illness that eventually required surgery and was later diagnosed as stage 4 non-Hodgkin's lymphoma. At this time, JF believed the project costs

were finally under control and, with it being open, would begin generating sufficient revenue to cover its ongoing operating costs based on projections researched and provided by RF. JF was unable to devote significant attention to the project while undergoing extensive chemotherapy. During this time, RF continued to manage the project and allowed costs to continue to skyrocket due to, among other things, abuse of overtime labor, construction of an outdoor rink, and the distribution of company issued phones, credit cards and vehicles. All of these were effectively at Clearview's cost as the only significant investor of the project. When JF's treatment regimen was finally completed in March 2015, JF began to become actively involved in the day-to-day operations of Twin Rinks due to mounting concerns while he was sick regarding inconsistencies in RF's descriptions of the operations, costs and his communications with creditors and potential financing counterparties. It became increasingly apparent that not only was the approved construction budget ignored, the ongoing operations of Twin Rinks were not being kept to the original forecasted budget. For example, salary costs were originally forecasted to be approximately $800,000, yet were over $1.8 million for FY 2014. Utility costs were twice what they had been forecast to be as a result of a lack of efficiency procedures. RF was thus removed of all decision-making authority with respect to Clearview and Twin Rinks in April 2015 and JF assumed full managerial control at that time.

JF made extensive efforts to turn the operations of Twin Rinks around in a short period of time: for example, salary figures were quickly corrected to under $1.2 million annualized, utility charges were cut by 50% and accounts receivable were collected. Upon assuming his active managerial role, JF also made contact with several large creditors of the LLC in an attempt to better understand their prior arrangements. The LLC's creditors expressed frustration at the lack of

6

communication, and many creditors threatened to commence litigation, advised that they would file liens, and the project's utility providers required an onerous repayment schedule to continue service. Because it became clear that Twin Rinks would be unable to generate sufficient funds to pay its creditors, JF began pursuing a potential sale of all or a portion of the assets or equity in the LLC. Despite having some interest in the project, none of the potential buyers were able to move quickly.

With pressure mounting from creditors, the LLC was forced to file Chapter 11 bankruptcy on June 8, 2015 with the assessment that waiting any longer had the potential to cause the LLC to run out of the funds necessary to conduct an organized sale through the Court and preserve the ongoing viability of Twin Rinks as an operating business. There is very encouraging evidence that the project is on the path to profitability as a result of increasing public awareness, positive trends in enrollment/participation figures in all programming and the expense reductions implemented under JF's management. JF wanted to ensure that viability could be maintained by keeping the doors to Twin Rinks open and thereby maximizing the recovery to the LLC's creditors.

On June 8, 2015, the Debtor commenced this case by filing a voluntary petition for reorganization under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code) the United States Trustee appointed a Creditors' Committee which retained Meyer, Suozzi, English and Klein, P.C.as its counsel. The Debtor has been in the process of liquidation its assets for the benefit of its creditors immediately prior to and subsequent to the Filing Date.

b.    **The Plan**

With respect to holders of Allowed Unsecured Claims, Class 3, the Debtor is seeking their acceptance of the Plan. The Plan provides that the holders of Allowed Unsecured Claims against the

7

Debtor shall be paid the *pro rata* portion of available cash arising from the liquidation of the Debtor's assets; less any payments on account of post confirmation expenses, Administrative Expenses, Allowed Priority Claims, Allowed Secured Claims and Allowed Priority Tax Claims. After the payment of post confirmation expenses, Administrative Expenses, Allowed Priority Claims, Allowed Secured Claims and Allowed Priority Tax Claims, Class 3 Claims shall share *pro rata* in all subsequent liquidations of the Debtor's assets. The ultimate distribution to Allowed Unsecured Claims in Class 3 is estimated to be approximately ___ % without interest on any such Claim. For a discussion of the treatment of the other classes of claims, see "V.a. PLAN OF REORGANIZATION - Classification and Treatment of Claims and Interests."

c.       **Key Considerations**

The Plan was designed to provide the holders of the Allowed Unsecured Claims an opportunity to recover on their Allowed Claims. The Debtor intends to negotiate with the Creditors Committee regarding the terms of the Plan.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR THE HOLDERS OF CLAIMS AND INTERESTS, AND THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AND INTERESTS AND RECOMMENDS THAT YOU ACCEPT THE PLAN.

d.       **Acceptance or Rejection Procedure**

The Debtor is seeking the acceptance of the Plan by the holders of the Allowed Unsecured Claims.

A Ballot to be used to accept or reject the Plan has been enclosed with all copies of this

8

Disclosure Statement mailed to holders of Claims whose Claims are impaired by the provision of the Plan and whose votes are being solicited hereunder.

9

No statements or information concerning the Debtor (particularly as to results of operations or financial condition, or with respect to the distributions to be made under the Plan) or any of the respective assets or business of the Debtor may be made (or should be relied upon) other than as set forth in this Disclosure Statement and accompanying Ballot. The statements and information about the Debtor and the financial statements of the Debtor included in this Disclosure have been prepared by the Debtor. After carefully reviewing this Disclosure Statement and the Exhibits hereto, please indicate acceptance or rejection on the enclosed Ballot.

TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY 5:00 P.M. NEW YORK CITY TIME ON _____ , 2015. BALLOTS SHOULD BE MAILED, FAXED OR DELIVERED TO: JONES & SCHWARTZ, P.C., COUNSEL TO THE DEBTOR, ONE OLD COUNTRY ROAD, SUITE 384, CARLE PLACE, NEW YORK 11514 (ATTENTION: HAROLD D. JONES, ESQ.).

THE FOREGOING IS A SUMMARY. THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO SHOULD BE READ IN THEIR ENTIRETY BY ALL HOLDERS OF CLAIMS AND INTERESTS IN DETERMINING WHETHER TO ACCEPT OR REJECT THE PLAN.

## II. DEFINITIONS

Unless the context requires otherwise, the following words and phrases shall have the meanings set forth below when used in initially capitalized form in this Disclosure Statement.

**Additional Funds**: Shall mean any assets of the Debtor, other than Estate Funds, which may be earned by the Debtor, or cash or other assets of the Debtor which may be obtained by the Debtor and available for distribution to creditors. Additional Funds shall not include Estate Funds and any interest earned thereon.

10

**Administrative Expenses:**    Collectively, any cost or expenses of administration of the Chapter 11 Case including an Allowed Claim under section 503(b) of the Bankruptcy Code and any such allowed item constituting (i) an actual and necessary post-Filing Date expense of preserving the Debtor's estate, (ii) an actual and necessary post-Filing Date expense of liquidating the assets of the estate of the Debtor or (iii) allowance of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 of the Bankruptcy Code.

**Allowed:**    With respect to Claims and Interests, (a) any Claim against or Interest in the Debtor, proof of which was timely filed or by order of the Bankruptcy Court was not required to be filed or (b) any Claim or Interest that has been or is hereafter listed in the schedules of liabilities filed as liquidated in amount and not disputed or contingent and, in each such case in (a) and (b) above, as to which either (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or by order of the Bankruptcy Court, or (ii) such an objection has been so interposed and the Claim or Interest has been Allowed by a Final Order or is allowed in a liquidated amount in this Plan (but only to the extent so Allowed). An Allowed Claim shall not include interest on the principal amount of such Claim from and after the Filing Date unless permitted to do so pursuant to the provisions of the Bankruptcy Code, this Plan or order of the Bankruptcy Court, nor shall it include any Claim not scheduled, or scheduled as disputed, contingent or unliquidated unless proof of which has been filed with the Bankruptcy Court on or before the Bar Date; nor shall any Claim which has not been filed before the Bar Date be entitled to distribution under the Plan in accordance with Bankruptcy Rule 3003.

**Allowed Claim:**    Any Claim against the Debtor that is or has become Allowed.

**Asset Purchase Agreement:**        "Asset Purchase Agreement" means that certain Asset

Purchase Agreement by and among the Debtor, as seller, and purchaser, as buyer, which provides for

the sale of certain or substantially all of the Debtor's assets, and was determined by the Debtor to be

the highest or otherwise best offer for such assets at the Auction.

   **Auction:**       "Auction" means the auction for the sale of the Debtor's assets to be held on

August   , 2015.

   **Bar Date:**       With regard to pre-Filing Date claims,            2015, the date

fixed by order of the Bankruptcy Court as the last date by which proofs of claim must be filed.

   **Ballot:**       With respect to any class of Claims or Interests that are impaired and entitled

to vote under this Plan, the form distributed, together with the Disclosure Statement, to holders of

Claims or Interests in such class to be used for the purpose of indicating acceptance or rejection of

this Plan, in connection with the Debtor's solicitation of acceptances or rejections of this Plan,

provided however that in accordance with Bankruptcy Rule 3003 (c) (2) the vote of any holder of a

Claim which is not an Allowed Claim shall not be counted and the holder of such Claim shall not be

entitled to receive any distribution under the Plan on account of such Claims.

   **Bankruptcy Code:**   Title 11 of the United States Code, as applicable from time to time

during the Chapter 11 Case.

   **Bankruptcy Court:**  The United States Bankruptcy Court for the Eastern

District of New York, or any other court having jurisdiction over the Chapter 11 Case.

   **Bankruptcy Rules:**   The Federal Rules of Bankruptcy Procedure, as amended, promulgated

under section 2075 of title 28 of the United States Code and the Local Rules of the Bankruptcy

Court, as applicable from time to time during the Chapter 11 Case.

12

**Business Day:**       Any day other than a Saturday, Sunday or other day on which banking institution in the State of New York are not required to be open or "Legal Holiday" as defined in Bankruptcy Rule 9006(a).

**Cash:**  Cash in United States dollars, which may be distributed by wire transfer or check.

**Causes of Action:**       Any and all actions, causes of action, including, without limitation, any causes of action on behalf of the Debtor, whether arising before or after the Filing Date, including the rights and powers of the Debtor pursuant to sections 510, 542, 544, 545, 546, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code (and all similar claims under any applicable State law), liabilities, suits, debts, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises, rights, variances, trespasses, damages, judgments, executions, claims, objections to claims and demand whatsoever, whether known or unknown, direct or contingent, in law, equity or otherwise.

**Chapter 11 Case:**       The Debtor's case under Chapter 11 of the Bankruptcy Code, which case was commenced on the Filing Date and in which Twin Rinks at Eisenhower, LLC. is the Debtor.

**Claim:** Any rights to (a) payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

**Committee:**  Committee means the Official Committee of Unsecured Creditors appointed by the United States Trustee pursuant to §1102 of the Code.

13

**Confirmation Date:**   The first date upon which the Confirmation Order shall be entered on the docket maintained by the Clerk of the Bankruptcy Court with respect to the Chapter 11 Case.

**Confirmation Order:**       The order of the Bankruptcy Court confirming this Plan.

**Consummation Date:**       The date on which the Debtor makes an initial distribution pursuant to Article 11 of the Plan, which date shall be no later than 45 days after the entry of a Final Order confirming the Plan.

**Creditor:**    Any Person that is the holder of a Claim against the Debtor that arose on or before the Filing Date or a claim against the Debtor's estate of the kind specified in sections 502(h) of the Bankruptcy Code.

**Disbursing Agent:**    Disbursing Agent shall mean the Debtor, or as may be designated as a replacement by the Debtor and the Committee to distribute the funds in the Liquidation Fund.

**Disclosure Statement:**   The Disclosure Statement describing this Plan, prepared in accordance with section 1125 of the Bankruptcy Code and approved by order of the Bankruptcy Court and distributed to the holders of Claims and Interests as amended or modified from time to time.

**Disputed Claim:**    Any Claim (a) which is scheduled as disputed, contingent or unliquidated, and as to which a timely proof of claim has been filed with the Bankruptcy Court (in which event clause (b) of this definition shall be applicable); or (b) proof of which has been timely filed with the Bankruptcy Court and an objection to the allowance thereof, in whole or in part, is interposed, which objection has not been settled or determined by a Final Order.

**Distribution Date:**    Distribution Date shall mean any date on which a distribution under the Plan is to be made to the holders of Allowed Claims.

The Debtor estimates that based upon an Allowed Class 3 Unsecured Class of approximately $47,000,000.00, (which includes the claims of Clearview Capital Management LLC in the amount of approximately $42,136,000.00) the dividend to Class 3 Creditors will ultimately be approximately ___% of the Allowed Unsecured Claims without interest. This analysis is based upon a review of the Debtor's schedules and the proofs of claim filed in the Debtor's case. The Debtor estimates that ultimately Allowed Unsecured Claims will not exceed $_____.

(iv) All Interests. All Interests are impaired. The existing Interests will be cancelled and their Interests will receive no distribution. This Class is deemed to have rejected the Plan.

## V. THE DEBTOR'S CHAPTER 11 PLAN OF LIQUIDATION

The Plan is a Plan of Liquidation proposed by the Debtor. The Plan, which is annexed hereto as Exhibit A, forms a part of this Disclosure Statement. This Disclosure Statement is qualified in its entirety by reference to the more detailed provision in the Plan.

**THE DEBTOR BELIEVES THAT (i) THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR HOLDERS OF CLAIMS AND INTERESTS, (ii) WITH RESPECT TO IMPAIRED CLASSES OF CLAIMS OR INTERESTS, THE DISTRIBUTIONS UNDER THE PLAN ARE GREATER THAN THE AMOUNTS WHICH WOULD BE RECEIVED IF THE DEBTOR WAS LIQUIDATED UNDER CHAPTER 7, AND (iii) ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND INTERESTS. THE DEBTOR, THEREFORE, RECOMMENDS THAT YOU ACCEPT THE PLAN.**

a.    Classification and Treatment of Claims and Interests Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests. Administrative Expenses and Priority Tax Claims of the kinds specified in Section 507(a)(1) and 507(a)(8) of the Bankruptcy Code (set forth in the Plan) have not been classified and are excluded from the following classes, in accordance with section 1123(a)(1) of the Bankruptcy Code.

**Priority Claims.**

Class 1.        Class 1 consists of all Allowed Priority Claims.

**Secured Claims.**

      Class 2.      Class 2 consists of all Allowed Secured Claims.

**Unsecured Claims.**

      Class 3.      Class 3 consists of all Allowed Unsecured Claims, and the non-priority portion of any claims for wages, vacation pay or sick pay against the Debtor.

**Interests.**

      Class 4.      Class 4 consists of all Allowed Interests in the Debtor.

b.    **Rejection of Executory Contracts.**  Any executory contract or unexpired lease, whose rejection or termination by the Debtor has not occurred on or prior to the Confirmation Date shall be deemed to have been rejected by the Debtor, on the Confirmation Date unless previously assumed by the Debtor prior to the Confirmation Date.  It is the Debtor's intention to reject all executory contracts and unexpired leases in connection with this Plan unless previously assumed by the Debtor prior to the Confirmation Date.

    **Bar Date for Rejection Damages.**  The Debtor no longer has any executory contracts, and the bar date for filing unsecured claims was _____ , 2015.  All such claims arising from rejection, shall be treated as Class 3

c.    **Means of Implementation.**

    **Liquidation of Debtor's Assets.** The Debtor intends to implement the Plan by the utilization of the Liquidation Fund for the payment of all amounts due under the Plan to be paid by the Disbursing Agent in order of priority as set forth herein.  The Debtor will use its best efforts to sell and dispose of all assets for the highest value and in the most expeditious manner pursuant to the Auction Procedures and will cause the Disbursing Agent to distribute all proceeds in accordance with the Plan.

**Effective Date**:        The first Business Day after the Confirmation Order becomes a Final Order.

**Executory Contract:**        Executory Contract means any of the contracts and unexpired leases to which the Debtor is a party or was a party as of the Filing Date and which are executory within the meaning of §365 of the Bankruptcy Code.

**Estate Funds**:    Shall mean the cash maintained in the DIP Bank Accounts held by the Debtor plus all interest accrued and to be earned thereon subsequent to the Confirmation Date.

**Filing Date**:    June 8, 2015, the date upon which a voluntary petition was filed by the Debtor with the Bankruptcy Court.

**Final Order:**    Final Order means an order or judgment of the Bankruptcy Court entered on the docket in the Debtor's case, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order not to be a Final Order.

**Liquidation Fund:**    Shall mean the Estate Funds and Additional Funds net of the fees and costs of distribution.

15

**Member Interest:** The member interests of Twin Rinks at Eisenhower, LLC.

**Person:**    Any individual, corporation, limited or general partnership, joint venture, association, joint stock company, estate, trust, unincorporated organization, government, governmental unit, agency or political subdivision thereof.

**Plan:** This Plan of Liquidation as amended or modified from time to time.

**Priority Claims:**    Any Claim, other than a Priority Tax Claim or an Administrative Expense, which is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

**Priority Creditor:**    Any Creditor that holds a Priority Claim.

**Priority Tax Claim:** Any Claim which is entitled to priority in payment under section 507(a) (8) of the Bankruptcy Code.

**Professional Fees:**    Fees and expenses of the Debtor's or the Creditors Committee's attorneys, accountants and other professionals retained by Court order.

**Pro Rata Share:**    Pro Rata Share means the proportion that the amount of an Allowed Claim or interest in a particular class bears to the aggregate amount of all Claims or interests in such class, including Disputed Claims, but not including Claims or interests that have been disallowed pursuant to a Final Order, as calculated on any date fixed for distribution of consideration under the Plan.

**Secured Claim:**    Any Allowed Claim including all amounts, if any, allowed pursuant to 11 U.S.C. §506(b), to the extent it is secured by a lien on property in which the Debtor's estate has an interest, to the extent of the value of the Claim holder's interest in such property.

**Tax Code:**    The Internal Revenue Code of 1986, as amended from time to time.

**Twin Rinks at Eisenhower, LLC.:** Twin Rinks at Eisenhower, LLC., a New York Limited Liability Corporation, the Debtor in Case No. 12-B-72466 (REG).

**Ultimately Allowed Claims**:    Any Disputed Claim to the extent that it becomes an Allowed Claim.

**Unclaimed Distribution**:    Unclaimed Distribution shall mean any distribution contemplated under the Plan unclaimed after the 120th day following the Distribution Date. Unclaimed Distributions shall include checks and the funds represented thereby; (a) which have been returned as undeliverable without a proper forwarding address; (b) which have not been paid; and (c) which were not mailed or delivered because of the absence of a correct address.

**Unsecured Claim**:    Any Claim other than an Administrative Expense, Secured Claim Priority Tax Claim, Priority Claim or Interest.

**Unsecured Creditor**: Any Creditor that holds an Unsecured Claim.

Whenever it appears appropriate from the context of usage, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

## III. INTRODUCTION

The Debtor submits this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code in connection with its solicitation of acceptances of the Plan. The purpose of this Disclosure Statement, including the Exhibits hereto, is to provide to holders of Claims and Interests who are entitled to accept or reject the Plan and whose votes are being solicited hereunder adequate information concerning the Plan to permit such holders to make an informed judgment as to whether to accept the Plan. Under section 1124 of the Bankruptcy Code, (a) any Creditor or holder of an Interest whose legal, contractual or equitable rights are not altered by the proposed treatment under the Plan or (b) any Creditor or holder or an Interest with respect to which the Plan provides for the curing of any default, reinstatement of maturity, and compensation for damages, and does not

17

otherwise alter the legal, equitable or contractual rights of the holder of such Claim or Interest holds a Claim or Interest in a class that is not impaired.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims are not included in classes and are not entitled to accept or reject the Plan. All Allowed Unsecured Claims (Class 3) are impaired under the Plan. All Allowed Unsecured Claims are entitled to accept or reject the Plan and may do so by completing the appropriate Ballot which is enclosed. All Allowed Priority Claims (Class 1) and Allowed Secured Claims (Class 2) are unimpaired under the Plan. Allowed Interests (Class 4) are impaired under the Plan and are deemed to have rejected the Plan. (See Section VI, "CONFIRMATION AND CONSUMMATION PROCEDURE' for a complete description of the requirements for acceptance of the Plan.).

a.    **Ballots Required**

ALL HOLDERS OF CLAIMS MUST COMPLETE AND RETURN THEIR BALLOTS TO ACCEPT OR REJECT PLAN.

b.    **Acceptance or Rejection Procedure.**

Ballots have been provided for holders of Allowed Unsecured Claims. Completed Ballots should be mailed, telecopied or delivered to Jones & Schwartz, P.C., counsel to the Debtor, One Old Country Road, Suite 384, Carle Place, New York 11525 (Attention: Harold D. Jones, Esq.) (Fax Number (516) 873-8711). Pursuant to Rule 3018 (a) of the Bankruptcy Rules, once a ballot has been delivered, the Person delivering such ballot may not thereafter change his acceptance or rejection of the Plan, except that the Bankruptcy Court, for cause shown and after notice and a hearing, may permit a holder of a Claim or Interest to change or withdraw an acceptance or rejection.

THE ACCEPTANCE OR REJECTION OF EACH HOLDER OF A CLAIM IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY JONES &

SCHWARTZ, P.C., COUNSEL TO THE DEBTOR, ONE OLD COUNTRY ROAD, SUITE 384, CARLE PLACE, NEW YORK 11514 (ATTENTION: HAROLD D. JONES, ESQ.) NOT LATER THAN 5:00 P.M., NEW YORK CITY TIME OF _____, 2015.

Section 1129(a) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan if certain conditions have been met and if each class of Claims or Interest that is impaired under the Plan has accepted the Plan.  Under Section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such class held by creditors that have accepted or rejected such plan, excluding holders whose acceptances or rejections were not in good faith.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more of the classes of claims or interests impaired thereunder if (i) at least one impaired class of claims accepts the plan (excluding any acceptances of "insiders," as such term is defined in section 101 of the Bankruptcy Code) and (ii) the Bankruptcy Court finds that, with respect to the non-accepting class or classes, the plan does not discriminate unfairly and is fair and equitable.

No statement or information concerning the Debtor (particularly results of operations or financial condition, or with respect to distributions to be made under the Plan or any of the respective assets or business of the Debtor) is authorized other than as set forth in this Disclosure Statement and accompanying ballot.  The statements and information about the Debtor and the financial statements of the Debtor contained herein have been prepared by the Debtor.

The Bankruptcy Court, pursuant to section 1128 of the Bankruptcy Code, has scheduled a hearing to consider the confirmation of the Plan and objections to confirmation, if any, to be held on

_____, 2015 at 10:00 a.m. before the Honorable Robert E. Grossman, United States Bankruptcy Judge at the United States Bankruptcy Court, 290 Federal Plaza, Central Islip, New York 11 722. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Objections to confirmation of the Plan, if any, must be in writing and filed and served as described below under Section VI.B. "CONFIRMATION AND CONSUMMATION PROCEDURE - Confirmation Hearing."

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR HOLDERS OF CLAIMS AND INTERESTS.   THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS AND INTERESTS AND RECOMMENDS THAT YOU ACCEPT THE PLAN.**

## IV.    GENERAL INFORMATION

a.    **Description of Business**

Twin Rinks is a new state-of-the-art, multi-surface ice arena and entertainment center, located in Eisenhower Park in East Meadow, New York.  Constructed in 2013-2014 and fully operational in September 2014, the facility features two indoor NHL-sized surfaces, along with a three-quarter sized outdoor ice rink, which is used as a sport court during non-winter months.  It also features a full service pro shop, Institute 3E workout facility, STEP Academy and is the home arena to the NY Bobcats, Long Island Gulls Youth Hockey, Long Island Dynamo and Ferraro Brothers Hockey.

b.    **Current Bankruptcy Case**

On June 8, 2015, a voluntary petition under Chapter 11 of title 11 of the U.S. Code ("Bankruptcy Code") was commenced by the Debtor.  The United States Trustee appointed a Creditors' Committee which retained Meyer, Suozzi, English and Klein, P.C. as its counsel.

Disclosure Statement – 7-9-15

(i)    Sale of Assets.  Both prior and subsequent to the Filing Date, the Debtor was in discussions with several entities for the sale of substantially all of the assets of the Debtor.  The Debtor believed that its creditors, customers, and employees would benefit from a "seamless" transaction with as little disruption in sales as possible.  Shortly prior to the Petition Date CMBS (an entity owned by JF) bought the secured claim of Darien Rowayton Bank at the full face amount of the indebtedness plus accrued interest.

(ii)    Since the commencement of the Chapter 11 case the Debtor, with the assistance of Getzler Henrich & Associates, (who have been retained subject to approval by the Bankruptcy Court) has been actively involved in soliciting offers for the sale of substantially all of the assets of the Debtor.  Those entities who have signed a non-disclosure agreement with the Debtor have been provided with confidential information concerning the Debtor and its financial position.  Those entities have also been provided access to a virtual data room which contains additional confidential information about the Debtor.  The Debtor has been in contact over fifty (50) entities who have expressed interest in acquiring substantially all of the assets of the Debtor.  In contemplation of the confirmation of a Plan of Liquidation, the Debtor has provided notice of an anticipated auction process which would be consummated as part of the confirmation of the Debtor's Plan.  Attached as Exhibit "C" is a copy of the Notice of Auction and Bidding Procedures (the "Auction Procedures") which the Debtor has provided to those parties who have expressed an interest in bidding on substantially all of the assets of the Debtor.  The Debtor intends to generate the amounts needed to fund the payments under the Plan from an auction conducted as set forth therein.

(iii)    Current Cash On Hand.  As of July    , 2015, the Debtor has cash on hand of approximately $_____.  Based upon the claims and the statutory priorities, the Debtor anticipates an approximate ____% distribution to Allowed Unsecured Claims.

21

c.      **Bar Date**

The Bankruptcy Court entered an order requiring all creditors to file proofs of claim in the

Bankruptcy Court by _____, 2015.

d.      **Formulation of the Plan**

As set forth more fully below in Article VI, Section C, the Debtor believes that the terms and

conditions of the Plan are far more favorable than the alternative of liquidation under Chapter 7.

e.      **The Plan**

(i)      Administrative Claims.  The Debtor estimates that the amounts outstanding for fees

and expenses payable for all Professional Fees is approximately $_____ as of _____,

2015.  The amount is subject to Bankruptcy Court approval.

(ii)    Secured Claims.  Allowed Priority Claims, Allowed Priority Tax Claims. All Allowed

Secured Claims, Allowed Priority Claims and Allowed Priority Tax Claims will be paid in full, in

cash, from the assets of the estate of the Debtor or such other terms as may be agreed between the

parties.  The Debtor does not believe there are any unpaid Priority Claims or Priority Tax Claims at

this time.  The Allowed Secured Claim is in the amount of $_____.  The funds

necessary to pay these claims will be from the assets of the estate.  The Debtor believes that the

aggregate amount of these claims is approximately $_____.

(iii)   Allowed Unsecured Claims.  Subject to the further provisions and conditions of this

Plan, all Allowed Unsecured Claims (other than Administrative Expenses, Priority Claims, Priority

Tax Claims, Reduced City Claim or the Unsecured portion of the Tax Claim) shall be paid the *pro*

*rata* portion of the cash on hand held by the Debtor; less any payments on account of Administrative

Expenses, Allowed Priority Claims, Allowed Secured Claims and Allowed Priority Tax Claims.

22

Unless otherwise provided for in the Confirmation Order, on the Effective Date or as soon thereafter as practicable, the Disbursing Agent after consultation with counsel for the Debtor and counsel for the Committee, shall establish an interest-bearing reserve account for such estimated amounts as may be needed to, inter alia, pay the costs and expenses of winding up the estate's affairs including the fees and expenses of the Disbursing Agent. Such costs and expenses will be paid by the Disbursing Agent as described herein.

**Disbursing Agent.**    The Debtor will act as the Disbursing Agent (or may retain a third party). The Disbursing Agent shall be responsible for disbursing, issuing and distributing monies and other consideration to the holders of Allowed Claims in this case. The Disbursing Agent, in the name of, and on behalf of the Debtor's estate, shall comply with all payment, withholding and reporting requirements imposed by federal, state and local authorities and all distributions made under the Plan shall be subject to such payment, withholding and reporting requirements. The Disbursing Agent, its agents or representatives shall not be liable to the Debtor or creditors for acts done in furtherance of this Plan, except for willful misconduct or fraud. The Disbursing Agent shall not be responsible for payments made pursuant to the Debtor's schedules, books and records or distribution schedule as prepared by the Debtor or its counsel, and as consistent with claims as may be Allowed Claims filed with the Bankruptcy Court. The Disbursing Agent shall be responsible for disbursing, issuing and distributing monies and other consideration to the holders of Allowed Claims in this case in accordance with the information provided by the Debtor, the scheduled filed in the case and the claims docket. The Disbursing Agent may retain professionals as necessary which shall be an expense of the post confirmation estate. The Disbursing Agent, its agents or representatives shall not be liable to the Debtor or creditors for acts done in furtherance of this Plan, except for willful misconduct or fraud. Prior to making any distributions under this Plan the Disbursing Agent

shall file with the Bankruptcy Court a notice of intended distribution. The notice of intended distribution shall identify the intended recipient and amount of the proposed distribution. The notice of intended distribution shall be served upon the Office of the United States Trustee, the Debtor's counsel and the Committee. The notice of intended distribution shall be filed and served on the aforesaid parties upon no less than 10 days notice. In the event no objection to the proposed distribution is filed within said period, the Disbursing Agent is authorized to make the distributions as identified in the notice of intended distribution. In the event a timely objection is filed, the proposed distributions subject to the objection shall not be made except upon subsequent Order of the Bankruptcy Court. The Disbursing Agent is authorized to make distributions as may be provided in the notice of intended distribution which are not subject to objection. The Disbursing Agent shall not be required to make any distribution in an amount less than $10.00

## VI. CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

a.      **Solicitation of Acceptance.**

As permitted by the Bankruptcy Code, the Debtor is soliciting, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, the acceptance of certain classes of Claims or Interests that are "impaired" under the Plan. The following classes are impaired:

Class 3 Allowed Unsecured Claims.

The Debtor is seeking the acceptance of the Plan by holders of Allowed Unsecured Claims (Class 3). Holders of Secured Claims (Class 2), Allowed Priority Claims (Class 1) and Class 4 Interests are deemed to have accepted the Plan.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the

allowed claims of such class who actually accept or reject a plan. The vote of a holder of a claim or interest may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any holder of a Claim (i) whose Claim has been scheduled in the schedules of assets and liabilities filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who has filed a Proof of Claim on or before the Bar Date is entitled to accept or reject the Plan.

The Debtor has concluded that this classification of Claims complies with section 1122 of the Bankruptcy Code and is in the best interest of the Debtor, its estate, Creditors, and holders of Interests.

b.    **Confirmation Hearing**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, to hold a hearing on the confirmation of the Plan. The Confirmation Hearing has been scheduled for _____, 2015 at 10:00 a.m. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing. Any objection to the confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon the following on or before _____, 2015.

The Debtor, to:        Jones & Schwartz, P.C.
                       One Old Country Rd., Suite 384
                       Carle Place, NY 11514
                       Attention: Harold D. Jones, Esq.

The Creditors' Committee, to:

27

Meyer, Suozzi, English and Klein, P.C.
990 Stewart Avenue, Ste. 300
Garden City, New York 11530
Attn: Howard B. Kleinberg, Esq.

Any of the above may, from time to time, change its address for future notices and other communications hereunder by filing a notice of the change of address with the Bankruptcy Court and by serving notice of the change of address on the above.

c.    **Confirmation**

(I)    General. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. The most relevant of these requirements are the following:

(A)    The Plan and the Debtor must comply with the applicable provisions of the Bankruptcy Code.

(B)    The Plan must have been proposed in good faith and not by any means forbidden by law.

(C)    Any payment made or to be made by the Debtor for services or for costs and expenses in, or in connection with, the Plan must have been approved by, or be subject to the approval of, the Bankruptcy Court as reasonable.

(D)    The Debtor must have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor or a successor to the Debtor under the Plan, and the appointment to or continuance in such office by such individual must be consistent with the interests of Creditors and equity security holders and with public policy. The Debtor must have disclosed the identity of any "insider" (as defined in section 101 (31) of the Bankruptcy Code) who will be employed or retained by the Debtor and the nature of any

28

compensation for such insider.

(E)     With respect to each impaired class of Claims or Interests whose votes are being solicited hereunder, each holder of a Claim or Interest in such class must either accept the Plan or receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Confirmation Date, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on the Confirmation Date under Chapter 7 of the Bankruptcy Code.  (See Section VI, "CONFIRMATION AND CONSUMMATION PROCEDURE - Confirmation - Best Interests Test.")

(F)     Each class of Claims or Interests must either accept the Plan or not be impaired under the Plan.  If this requirement is not met, the Plan may still be confirmed pursuant to section 1129 (b) of the Bankruptcy Code.

(G)     Except to the extent that the holder of a claim has agreed to a different treatment of such Claim, the Plan must provide that (1) Administrative Expenses will be paid in full in Cash on the Consummation Date, (2) Priority Claims will be paid in full in Cash on the Consummation Date, or if the class of such Claims accepts the Plan, the Plan may provided for deferred Cash payments, of a value, as of the Consummation Date, equal to the Allowed Amount of such claims, and (3) the holder of a Priority Tax Claim will be paid in full in cash on the Consummation Date an Amount equal to the Allowed amount of such Claim or upon such other terms as may be agreed between the Debtor and the holder of an Allowed Priority Tax Claim.

(H)     If a class of Claims is impaired under the Plan, at least one class of Claims that is impaired by the Plan must accept the Plan, determined without including any acceptance of the Plan by any "insider."

(I)     All fees payable under section 1930 of title 28 of the United States Code, as

determined by the Bankruptcy Court at the Confirmation Hearing, must have been paid or the Plan must provide for the payment of all such fees on the Consummation Date. The Debtor believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code. Certain of these requirements are discussed in more detail below.

(II)     Best Interests Test. In order to meet the "best interests" test of section 1129 (a) (7) of the Bankruptcy Code, the Debtor must establish that each holder of a Claim or Interest in an impaired class either (A) has accepted the Plan or (B) will receive or retain under the Plan in respect of its Claim or Interest, property of a value, as of the Confirmation Date, that is not less than the amount such holder would receive or retain if each of the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine the recovery that Creditors and holders of Interests would receive if the Debtor was to be liquidated, the Bankruptcy Court must determine the amount of Cash that would be generated from the liquidation of the assets and properties of the Debtor's Chapter 7 liquidation case. The dollar amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the assets of the Debtor in liquidation cases plus the Cash held by the Debtor at the time of the commencement of the liquidation cases and any interest earned on the investment thereof minus the costs and expenses of the liquidations and any additional administrative and priority claims that may result from the termination of the Debtor's business and the completion of liquidation under Chapter 7.

The costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case. The foregoing types of Claims and such other Claims as may arise in the liquidation cases or result from the pending Chapter 11

30

Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Claims.

Under the "best interests" test, all Persons holding Allowed Unsecured Claims in a particular class having the same rights upon liquidation would be treated as a single class for purposes of determining the potential distribution of the proceeds from the liquidation of the assets of the Debtor under Chapter 7. The distributions payable to each of the Creditors in a class from the liquidation proceeds would be calculated pro rata according to the amount of the claim in such class held by each Creditor. The Debtor believes that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolutely priority of distributions.

The Debtor has carefully considered the probable effects of liquidation under chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Interests, including the following:

(A) the probable costs and expenses of such liquidations;

(B) the possible adverse effect of liquidation under Chapter 7 on the realizable values of the Debtor's assets and properties; and

(C) the possible substantial increases in Claims which would rank prior to or on a parity with those of Allowed Unsecured Creditors.

After considering these factors, among others, the Debtor has concluded, as set forth in Section IX, "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN - Liquidation Under Chapter 7," that the projected proceeds of a hypothetical chapter 7 liquidation and the resulting distributions of such proceeds to the various classes of Creditor and holders of Interests, that the value of the distributions to each class of Creditors pursuant to the Plan is materially greater than the value of the distributions to such class in a chapter 7 liquidation.

31

(iii) Acceptance. The class consisting of Allowed Unsecured Claims is impaired and must accept the Plan in the manner described under Section VI.a. "CONFIRMATION AND CONSUMMATION PROCEDURE — Solicitation of Acceptances," or the tests described below under Section VI, "CONFIRMATION AND CONSUMMATION PROCEDURE — Confirmation — Confirmation over a Dissenting Class," must be met with respect to each class that does not accept the Plan by the requisite vote.

(iv)    Confirmation Over a Dissenting Class. In the event that any impaired class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if all other requirements under section 1129 (a) of the Bankruptcy Code are satisfied, and if, with respect to each impaired class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable." Confirmation pursuant to section 1129 (b) of the Bankruptcy Code requires that at least one impaired class of Claims accept the Plan, excluding any acceptance of the Plan by an "insider" (as defined in section 101 (31) of the Bankruptcy Code).

If one of the impaired classes of Claims does not accept the Plan in accordance with section 1126 of the Bankruptcy Code, the Debtor will ask the Court to confirm the Plan pursuant to section 1129 (b) of the Bankruptcy Code. The Debtor believes that the Plan provides for the fair and equitable treatment of the Unsecured Creditors pursuant to Section 1129 (b) (2) (B) of the Bankruptcy Code. The Debtor therefore believe that any request by the Debtor for confirmation of the Plan, notwithstanding a rejection by the classes of Allowed Unsecured Claims, pursuant to section 1129 (b) (2) (B) of the Bankruptcy Code will be granted. In furtherance of such request, however, the Debtor reserves the right, in his discretion, to modify or waive any provision of the Plan. The Debtor believes that the plan is "fair and equitable" and that the Plan does not

32

"discriminate unfairly."

(A)    Fair and Equitable. The "fair and equitable" test requires absolute priority in the payment of claims and interests with respect to the non-accepting class or classes. The "fair and equitable" test established by the Bankruptcy Code is different for secured claims, unsecured claims and equity interests, and includes the following treatment:

1.    Secured Claims. A plan will be deemed fair and equitable with respect to a non-accepting class of secured claims if (a) the holder of each claim in such class will retain its lien or liens and receive deferred cash payments totaling the allowed amount of its claim, of a value, as of the Confirmation Date, equal to the value of such holder's interest in the collateral, (b) the holder of each claim in each class will receive the proceeds from any sale of such collateral, or (c) the holder of each claim in such class will realize the indubitable equivalent of its allowed secured claim.

2.    Unsecured Claims. A plan will be deemed fair and equitable with respect to a non-accepting class of unsecured claims if (a) the holder of each claim in such class will receive or retain under the plan property of a value, as of the Confirmation Date, equal to the allowed amount of its claim, or (b) holders of claims or interests that are junior to the claims of such creditors will not receive or retain any property under the plan on account of such junior claim or interest.

3.    Interests. A plan will be deemed fair and equitable with respect to a non-accepting class of interests if the plan provides that (a) each member of such class receives or retains, on account of its interest property of a value, as of the Confirmation Date, equal to the greatest of the allowed amount of any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) holders of interests that are junior to the interests of such class will not receive or retain any property under the Plan on account of such junior interests. The Debtor believes the Plan satisfies the "fair and equitable test" with respect to all impaired classes.

Under the Bankruptcy Code, the allowed amount of an Unsecured Creditor's Claim includes accrued interest, as of the Filing Date, but excludes any interest accruing after the Filing Date (see 11 U.S.C. Section 502). Unsecured Creditors are entitled to post-Filing Date interest only if a Chapter 7 liquidation would yield a surplus of proceeds sufficient to satisfy all Claims provided for by section 726 (a) (1)-(4) of the Bankruptcy Code, and then only to the extent of such excess and at the legal rate of interest (see 11 U.S.C section 1129 (a) (7); 11 U.S.C. section 726 (a)). A liquidation of the Debtor's assets would yield a significantly lower distribution to holders of Allowed Unsecured Claims.

Accordingly, the Debtor believes that the Plan satisfies the "fair and equitable test" for all holders of Claims and Interests.

(B)    No Unfair Discrimination. A plan of reorganization "does not discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to non-accepting class is equal or otherwise fair when compared to the value of distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtor believes the Plan complies with this requirement.

d.    Consummation

If the Plan is confirmed, the Plan will be consummated and distributions will be made on, or as soon as practicable after, the Confirmation Date, except as provided in the Plan.

## VII. FEDERAL INCOME TAX CONSEQUENCES

The Debtor has not analyzed and will not analyze the federal income tax consequences of the Plan as it pertains to the Creditors and holders of Interests. Accordingly, all Creditors and holders of Interest in the Debtor are strongly urged to consult their own tax advisors regarding the tax consequences of the Plan to them and to the Debtor. The Debtor and its counsel are not making any

representations regarding the particular tax consequences of confirmation and consummation of the Plan as to any creditor or holder of an Interest in the Debtor nor is the Debtor rendering any form of legal opinion as to such tax consequences.

## VIII. ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code or (b) an alternative chapter 11 plan or plans.

a.    **Liquidation Under Chapter 7**

Section 1129 (a) of the Bankruptcy Code provides that the Bankruptcy Court may confirm a plan only if the requirements contained in such section are met. One of these requirements is that each non-accepting holder of an allowed claim or an allowed interest in an impaired class must receiver or retain under the plan on account of such claim or interest property having a value as of the effective date of the plan at least equal to the value that such holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the plan. (See Section VI "CONFIRMATION AND CONSUMMATION PROCEDURE-- Confirmation--Best Interests Test.") The Debtor believes that in the event of a liquidation under Chapter 7, holders of Allowed Unsecured Claims would receive significantly less than under the Plan. See Estimated Liquidation Analysis -Exhibit B.

## IX. CONCLUSION

THE DEBTOR APPROVES OF AND SUPPORTS THE PLAN. THE DEBTOR URGES CREDITORS TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOT SO THEY WILL BE RECEIVED BY JONES & SCHWARTZ, P.C.,

COUNSEL TO THE DEBTOR, ONE OLD COUNTRY ROAD, SUITE 384, CARLE PLACE, NEW

YORK 11514 (<u>ATTENTION:</u> HAROLD D. JONES, ESQ.) NO LATER THAN 5:00

P.M., NEW YORK CITY TIME, ON _____, 2015.

Dated   Carle Place, New York
       July 7, 2015

<div style="margin-left:40%">

Respectfully submitted,

**TWIN RINKS AT EISENHOWER, LLC**
Debtor and Debtor in Possession

By:_____
    Joel Friedman, Authorized Member

</div>

Jones & Schwartz, P.C.
Attorney for Debtor and Debtor in Possession

By:_____
    Harold D. Jones A Member of the Firm
    One Old Country Rd, Ste. 384
    Carle Place, NY 11514
    (516) 873-8700

<u>EXHIBIT "A"</u>

CHAPTER 11 DEBTOR'S PLAN
OF LIQUIDATION

EXHIBIT "B"

ESTIMATED LIQUIDATION ANALYSIS
As of July    , 2015

Cash on Hand                                                                                    $

Less:   Unpaid Chapter 11 Administrative Costs (Est.)                      $

          Pre-petition Priority Claims (Approximate)              $

          Costs and Expenses of Chapter 7 Trustee and
          Professionals (Est.)                                            $

Balance Available for Allowed Unsecured Claims                             $

Ultimately Allowed Unsecured Claims                          $

Percentage Distribution Under Chapter 7 (Est.)                             $

Estimated Distribution Under Chapter 11 Plan

EXHIBIT "C"

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

TWIN RINKS AT EISENHOWER, LLC,                    Chapter 11

                                                  Case No. 15-72466-REG

                              Debtor.
-------------------------------------------------------------X

## NOTICE OF AUCTION

PLEASE TAKE NOTICE THAT:

1.    On June 8, 2015, the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for Eastern District of New York.

2.    The Debtor is seeking to sell substantially all of the assets of the Debtor (the "Twin Rinks Assets") to the Successful Bidder or Back-Up Bidder. Approval of the sale of assets to either the Successful Bidder or Back-Up Bidder may result in, among other things, the assumption, assignment and/or transfer by the Debtor of certain executory contracts and leases.

3.    Pursuant to the Bidding Procedures, if the Debtor receives any Qualified Bids (as defined in the Bidding Procedures), the auction for the Twin Rinks Assets shall take place on **August 19, 2015, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Proskauer Rose, LLP, 11 Times Square, New York, New York 10036, or at such other place and time as the Debtor shall notify all Qualified Bidders and other invitees. Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures by no later than **August 13, 2015, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"), may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Twin Rinks Assets must submit its bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.    The Hearing to consider approval of the Sale of the Twin Rinks Assets to the Buyer or such other Successful Bidder or Back-Up Bidder free and clear of all liens, claims and encumbrances will be held before the Honorable Robert E. Grossman in the United States Bankruptcy Court Eastern District of New York, 290 Federal Plaza, Central Islip 11722 on the same date and time as the hearing on Confirmation of the Debtor's plan (the "Sale Hearing"), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.    This Notice and the Sale Hearing is subject to the complete terms and conditions of the Bidding Procedures, which shall control in the event of any conflict and the Debtor encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Twin Rinks Assets or in obtaining a copy of

any related document, subject to any necessary confidentiality agreement, may make a written request to: counsel for the Debtor, Jones & Schwartz, P.C. One Old Country Road, Suite 384, Carle Place, New York 11514, Attn: Harold D. Jones, Esq. and Proskauer Rose, LLP, 11 Times Square, New York, New York 10036, Attn: Jeffrey W. Levitan (collectively, the "Notice Parties").

Dated:  Carle Place, New York
       June 23, 2015


                              JONES & SCHWARTZ, P.C.
                              Counsel for Debtor and
                              Debtor-In-Possession


                        By:   /s/Harold D. Jones
                              Harold D. Jones (HDJ-4652)
                              A Member of the Firm
                              One Old Country Road, Suite 384
                              Carle Place, New York 11514
                              (516) 873-8700

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

TWIN RINKS AT EISENHOWER, LLC,                    Chapter 11

                                                  Case No. 15-72466-REG

                                Debtor.
-----------------------------------------------------------------X

## BIDDING PROCEDURES

        On June 8, 2015, Twin Rinks At Eisenhower, LLC, the debtor and debtor in possession (the "Debtor") filed a voluntary petition under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York. The Debtor will utilize the following procedures through which it will determine the highest or otherwise best price for the sale of substantially all, or certain of the assets owned or leased by the Debtor (collectively, the "Twin Rinks Assets") in one or more lots to one or more successful bidders.

        The Debtor will determine the highest or otherwise best bid for the Twin Rinks Assets through the process and procedures set forth below (the "Bidding Procedures"). As set forth below, the Debtor reserves the right to modify the Bidding Procedures.

        The sale will be subject to competitive bidding as set forth herein and approval of the Court pursuant to sections 105, 363, 365 and 1129 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

Assets to be Sold

        The Twin Rinks Assets generally constitute all of the operating assets owned or leased by the Debtor including, but not limited to a license with the County of Nassau. The Debtor is offering bidders the opportunity to bid on some or all of the Twin Rinks Assets (the "Sale").

**Participation Requirements**

        In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in entering into a Sale Transaction for some or all of the Twin Rinks Assets (a "Potential Bidder") must first deliver an executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel.[1]

---

[1]   To the extent any party executed a confidentiality agreement prior hereto, such party does not need to execute another confidentiality agreement in order to comply with the Bidding Procedures or become a Qualified Bidder.

**Bid Requirements**

In order to participate in the bidding process and be deemed a "Qualified Bidder," a Potential Bidder must submit a "Qualified Bid" by the Bid Deadline. The Debtor, in consultation with a Committee and Secured Creditor, shall make a determination regarding whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (New York Time) on August 18, 2015. The Debtor reserves its right to contact bidders before or after the Bid Deadline to discuss or clarify the terms of their bid and to indicate any terms which may need to be modified in order to conform the bid to a Qualified Bid or otherwise evaluate the bid. If no timely, conforming Qualified Bids are submitted by the Bid Deadline, the Debtor shall not hold the Auction but expressly reserve the right to extend the Bid Deadline (after consultation with a Committee and Secured Creditor). To constitute a Qualified Bid, a bid must, among other things:

(i)     provide to the Debtor and its counsel the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a transaction with the Debtor, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtor that demonstrates the Potential Bidder's financial ability to consummate a transaction and (y) a written commitment acceptable to the Debtor of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); provided that if a Potential Bidder is unable to provide Financials, the Debtor may accept such other information sufficient to demonstrate to the Debtor's reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate a sale transaction. Potential Bidders shall not be allowed to review or obtain the Financials of other Potential Bidders;

(ii)    include a cover letter identifying whether the Potential Bidder is interested in purchasing some or all of the assets. If the Qualified Bidder is submitting a bid only with respect to certain of the Twin Rinks Assets, the cover letter must identify which assets are included in the bid;

(iii)   state that the Potential Bidder offers to consummate the sale pursuant to the form purchase agreement to be provided by the Debtor prior to the Bid Deadline (the "Purchase Agreement"). If any bid is conditioned on the assumption and assignment of executory contracts and/or unexpired leases, then such potential bidder shall be required to provide evidence of its ability to provide adequate assurance of future performance of such contracts or leases along with the bid;

(iv)    be an all-cash bid;

(v)     contain a list of the Debtor's executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtor;

(vi)    confirm that the offer shall remain open and irrevocable as provided below;

(vii)   enclose a clean signed copy of the proposed marked Purchase Agreement and a blacklined copy reflecting any changes;

(viii)  be accompanied with a certified or bank check or wire transfer in an amount equal to ten percent (10%) of the proposed purchase price set forth in the bid as a minimum good faith deposit (the "Minimum Deposit"), which Minimum Deposit shall be: (a) deposited into an escrow account pursuant to an executed escrow agreement; and (b) used to fund a portion of the purchase price provided for in the bid;

(ix)    not be conditioned on obtaining financing or the outcome of any due diligence by the Potential Bidder;

(x)     fully disclose the identity of each entity that will be bidding for the Twin Rinks Assets or otherwise participating in connection with such bid, and the complete terms of any such participation; and

(xi)    provide for a closing date no later than September 18, 2015.

If a bid submitted on or prior to the Bid Deadline fails to meet all the requirements of a Qualified Bid, the Debtor is entitled to work with the bidder in an effort to cure any defects in the bid and to cause such bid to become a Qualified Bid prior to the commencement of the Auction. In addition, the Debtor may, after consultation with a Committee and Secured Creditor, waive one or more defects and cause such bid to be a Qualified Bid prior to the commencement of or during the Auction.

A bid received from a Potential Bidder that meets the requirements set forth above which is timely received will be considered a Qualified Bid if the Debtor believes that such bid would be consummated if selected as a Successful Bid (defined below).

After the Bid Deadline (defined below), the Debtor, in consultation with a Committee and Secured Creditor, shall determine which Qualified Bid or combination of Qualified Bids represents the then-highest or otherwise best bid for the Twin Rinks Assets (the "Starting Qualified Bid"). Prior to the commencement of the Auction, the Debtor shall distribute copies of the Starting Qualified Bid to each Qualified Bidder.

**Bid Deadline**

The deadline for submitting bids on the Twin Rinks Assets by a Potential Bidder shall be August 13, 2015, at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

A Potential Bidder that desires to make a bid must deliver written and electronic copies of their bid so that they are actually received prior to the Bid Deadline by: (i) counsel for

the Debtor, Jones & Schwartz, P.C. One Old Country Road, Suite 384, Carle Place, New York 11514, Attn: Harold D. Jones, Esq. and (ii) Proskauer Rose, LLP, 11 Times Square, New York, New York 10036, Attn: Jeffrey W. Levitan, Esq. (collectively, the "Notice Parties").

**Obtaining Due Diligence Access**

The Debtor shall afford each Potential Bidder reasonable due diligence information. Site access shall be provided upon reasonable request to the Debtor at the discretion of the Debtor within its reasonable business judgment. Potential Bidders cannot question the Debtor's employees during site visits without the Debtor's consent. The due diligence period will end on the Bid Deadline.

The Debtor shall not be obligated to furnish any information relating to the Debtor, the Twin Rinks Assets and/or the Sale to any person except to a Potential Bidder. The Debtor shall give each Potential Bidder reasonable access to all written due diligence information provided to another Potential Bidder.

The Debtor shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

**Due Diligence From Potential Bidders**

Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the Sale. Failure by the Potential Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a Potential Bidder is not a Qualified Bidder and that a bid made by a Potential Bidder or a Qualified Bidder is not a Qualified Bid.

**"As Is, Where Is"**

The Sale of the Twin Rinks Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agent or estate, except to the extent set forth in the purchase agreement between the Debtor and the Successful Bidder. All of the Debtor's right, title and interest in and to the Twin Rinks Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests"), with such Interests to attach to the net proceeds of the Sale of the Twin Rinks Assets, with the same validity and priority as existed immediately prior to such Sale.

Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Twin Rinks Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Twin Rinks Assets or the completeness of any information provided in

connection with the bidding process, in each case except as expressly stated in the marked Purchase Agreement.

**The Auction**

   If more than one Qualified Bid by a Qualified Bidder is received by the Bid Deadline (or if a non-qualified bid received by the Bid Deadline is qualified prior to the commencement of the Auction), an Auction with respect to a sale of the Twin Rinks Assets shall take place on **August 19, 2015, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Proskauer Rose, LLP, 11 Times Square, New York, New York 10036, or at such other place and time as the Debtor shall notify all Qualified Bidders and other invitees. If, however, no such Qualified Bids are received by the Bid Deadline, or if a non-qualified bid received by the Bid Deadline is not qualified prior to the commencement of the Auction, then the Auction will not be held.

<u>Auction Rules</u>:

   (xii) Only Qualified Bidders who have submitted a Qualified Bid for some or all of the Twin Rinks Assets and their authorized representatives will be eligible to participate at the Auction and to increase their bids. Representatives of a Committee and the Secured Creditor may attend the Auction. After the Bid Deadline, the Debtor, in consultation with a Committee and the Secured Creditor, shall determine which Qualified Bid or combination of Qualified Bids represent the then-highest or otherwise best bid for the Twin Rinks Assets (the "<u>Starting Qualified Bid</u>"). Prior to the commencement of the Auction, the Debtor shall distribute copies of the Starting Qualified Bid to each Qualified Bidder. The Auction shall commence with the Starting Qualified Bid and then proceed in minimum increments to be announced at the Auction (the "<u>Overbid Increment</u>"). The Debtor shall not consider any subsequent bid in the Auction unless any bid after the Starting Qualified Bid exceeds the previous highest bid by at least the Overbid Increment; provided, however, that in the event the Debtor selects a combination of Qualified Bids to serve as the Starting Qualified Bid, the Debtor, in consultation with a Committee and the Secured Creditor, reserves the right to determine an appropriate Overbid Increment. During the course of the Auction, the Debtor shall inform each participant which Qualified Bid(s) reflects, in the Debtor's view, after consultation with a Committee and the Secured Creditor, the highest or otherwise best offer or combination of offers.

   (xiii) The Auction may be adjourned as the Debtor deems appropriate after consultation with a Committee and the Secured Creditor. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders that have submitted a Qualified Bid and counsel for a Committee and Secured Creditor.

(xiv) Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding provided, however, in order to obtain the highest and/or otherwise best bid, the Debtor may engage in discussions with one or more Qualified Bidders if it determines, after consultation with a Committee and the Secured Creditor, that the combination of all or a portion of bids received from such Qualified Bidders would yield the highest and/or otherwise best offer at the Auction.

## Other Terms

All Qualified Bids, the Auction, and the Bidding Procedures are subject to modification and/or additional terms and conditions as are announced by the Debtor (after consultation with a Committee and the Secured Creditor). At the conclusion of the Auction, the Debtor shall announce the bid or combination of bids made pursuant to the Bidding Procedures Order that represents, in the Debtor's discretion (after consultation with a Committee and the Secured Creditor), the highest or otherwise best offer for a Sale Transaction (the "Successful Bid"). Prior to the entry of any order approving a sale, the Debtor shall announce the identity of the Qualified Bidder or combination of Qualified Bidders who submitted the Successful Bid at the Auction (the "Successful Bidder"). If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction, (ii) definitive documentation has been executed in respect thereof and (iii) the Court has approved the Sale to the Successful Bidder. Such acceptance by the Debtor is conditioned upon approval by the Court of the Successful Bid and the entry of an order approving such Successful Bid.

## Irrevocability of Certain Bids

The Successful Bid and the bid of the Qualified Bidder or combination of Qualified Bidders (the "Back-Up Bidder") that submits the next highest or otherwise best bid or combination of bids (the "Back-Up Bid") shall be irrevocable until the earlier of: (i) sixty (60) days after entry of the order approving the Successful Bid and, (ii) closing of the sale to the Successful Bidder or the Back-Up Bidder. Following the entry of the order if the Successful Bidder fails to consummate the transaction for any reason, the Back-Up Bid will be deemed the new Successful Bid, and the Debtor will be authorized, but not required, to consummate the transaction with the Back-Up Bidder without further order of the Court. In such case, the defaulting Successful Bidder's Minimum Deposit shall be forfeited to the Debtor and the Debtor shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder.

The Debtor will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below) and if the Auction results in a Sale Transaction, the Debtor will request certain findings from the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was conducted and the Successful Bidder was selected in accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure and (iii) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Twin Rinks Assets and is in the best interests of the Debtor and its creditors.

**Sale Hearing**

A hearing to consider approval of the Sale of the Twin Rinks Assets to the Successful Bidder will take place before the Honorable Robert E. Grossman in the United States Bankruptcy Court Eastern District of New York, 290 Federal Plaza, Central Islip 11722 on the same date and time as the hearing on Confirmation of the Debtor's plan.

**Return of Deposit**

Except as otherwise provided in this paragraph with respect to any Successful Bid and any Back-Up Bid, the Minimum Deposits of all Qualified Bidders that submitted such a deposit under the Bidding Procedures shall be returned upon or within five (5) business days after the conclusion of the Sale Hearing. The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale of the Twin Rinks Assets and applied in accordance with the Successful Bid. The Minimum Deposit of any Back-Up Bidder shall be returned upon or within the earlier of (i) sixty (60) days after entry of the Sale Order or (ii) the closing of the Sale of the Twin Rinks Assets to the Successful Bidder.

**Failure to Close**

If the Successful Bidder fails to consummate the transaction in accordance with the terms of the applicable agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason, the Debtor shall: (i) retain the Successful Bidder's Minimum Deposit; (ii) maintain the right to pursue all available remedies, whether legal or equitable; and (iii) be free to consummate the proposed transaction with the Back-Up Bidder at the highest price bid by the Back-Up Bidder at the Auction, without the need for an additional hearing or Order of the Court.

**Reservation of Rights**

Except as otherwise provided in the Bidding Procedures, the Debtor reserves the right as it may reasonably determine to be in the best interests of its estate, after consultation with a Committee and the Secured Creditor, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid or combination of Qualified Bids is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtor and its estate; (v) remove the Twin Rinks Assets from the Sale; (vi) waive terms and conditions set forth herein with respect to all potential bidders; (vii) impose additional terms and conditions with respect to all potential bidders; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; (x) modify the Bidding Procedures, as a Debtor may determine to be in the best interests of its estate after consultation with the Committee and Secured Creditor; or (xi) withdraw the Motion at any time prior to the Sale Hearing with or without prejudice.

**Expenses**

Any bidders presenting bids shall bear their own expenses in connection with the proposed sale, whether or not such sale is ultimately approved.